**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a Delaware Corporation, Burlington Northern, Inc., a Delaware Corporation, Union Pacific Railroad Company, a Utah Corporation, and Chicago, Milwaukee, St. Paul and Pacific Railroad Company, a Wisconsin Corporation, Plaintiffs,**

v.

**James A. REDDEN, Attorney General of the State of Oregon, Defendant,**

**United Transportation Union, Intervening Defendant.**

**Civ. No. 75–1009.**

United States District Court, D. Oregon.

Sept. 15, 1978.

Michael J. Lilly, Portland, Or., for plaintiff Southern Pacific Transportation Co.

Randall B. Kester, Portland, Or., for plaintiff Union Pacific Railroad Co.

Roger J. Crosby, Portland, Or., for plaintiff Burlington Northern, Inc.

James E. Nelson, Seattle, Wash., for plaintiff Chicago, Milwaukee, St. Paul and Pacific Railroad Co.

Rhidian M. M. Morgan, Asst. Atty. Gen., Salem, Or., for defendant.

Ann Morgenstern, Portland, Or., for intervening defendant.

## OPINION and ORDER

BURNS, District Judge:

Several railroad companies bring this action for declaratory and injunctive relief. They contend that a 1975 Oregon statute is unconstitutional or preempted by the federal law governing railroads.[1] The action must be dismissed for lack of jurisdiction because it doe not present a justiciable "case or controversy."[2]

Plaintiffs are railroad companies (Railroads) engaged in the business of operating railroads in interstate and intrastate commerce. Each is qualified to do business in Oregon. Defendant Redden (Attorney Gen-

---

1. Plaintiffs contend that the Oregon statutes are preempted by The Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq. (1970), the National Railway Labor Act, 45 U.S.C. §§ 151 et seq. (1970), 45 U.S.C. § 32 (1970), 45 U.S.C. §§ 38–43 (1970) and 45 U.S.C. § 437 (1970). Plaintiffs contend that the statutes are unconstitutional in that, in addition to violating the Supremacy Clause, they

(1) constitute an unreasonable burden on interstate commerce,
(2) deprive plaintiffs of the equal protection of the law,
(3) deprive plaintiffs of their privileges and immunities,
(4) deprive plaintiffs of their property without due process of law, and

(5) have a chilling effect on plaintiff's exercise of their right to free speech.

2. I raised this question myself. Case law shows this to be an important judicial duty. See California v. LaRue, 409 U.S. 109, 112 n.3, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); cf. Steffel v. Thompson, 415 U.S. 452, 458, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); O'Shea v. Littleton, 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

Because I dismiss for failure to present a justiciable "case or controversy," I need not reach the statutory jurisdictional issues presented in Intervenor's Motion to Dismiss.

eral) is the Attorney General of the State of Oregon. The intervening defendant United Transportation Union (Union) represents many of the plaintiffs' employees pursuant to the National Railway Labor Act, 45 U.S.C. §§ 151 et seq. (1970) (NRLA).

The Railroads challenge Chapter 512, Oregon Laws 1975,[3] which is codified as ORS 17.075, 17.085, 17.990 (1978). This statute reads as follows:

"17.075 When settlement prohibited between employer and employe. (1) An employer whose interest is or may become adverse to that of an injured employe shall not, within 15 days from the date of the occurrence causing the employe's injury:

"(a) Negotiate or attempt to negotiate a settlement or compromise with the injured employe; or

"(b) Obtain or attempt to obtain a general release of liability from the injured employe; or

"(c) Obtain or attempt to obtain any statement, either written or oral from the injured employe.

"(2) Paragraph (c) of subsection (1) of this section does not apply to the extent that compliance with statutes or rules of federal or state agencies requiring reports of accidents and injuries necessitates obtaining an employe statement within the 15-day period following the date of the injury.

"(3) Any settlement or compromise agreement entered into, any general release of liability or any written or oral statement made by any employe after he incurs a personal injury, which is not obtained in accordance with ORS 17.085, requiring notice, may be disavowed by the injured employe within 12 months following the date of the injury and such statement, release, compromise or settlement shall not be admissible evidence in any court action or administrative proceeding relating to the injury.

"17.085 When settlement allowed. ORS 17.075 relating to settlements, compromises, releases and statements obtained by an employer whose interest is or may become adverse to an injured employe shall not apply, if at least five days prior to obtaining the settlement, compromise, release or statement, the injured employe has signified his willingness that a settlement, compromise, release or statement be given.

"17.990 Penalties. A person wilfully violating subsection (1) of ORS 17.075 shall upon conviction be fined not more than $1,000."

The Railroads employ workers who are engaged in interstate commerce. These employees can and do file claims under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq. (1970) (FELA) against the Railroads relating to injuries sustained in the course of their duties. Many such actions are filed against the Railroads each year.[4]

Various groups of the Railroads' employees are represented by labor unions. Pursuant to the NRLA, the Railroads have entered into collective bargaining agreements with these unions. The collective bargaining agreements typically provide for hearings when employees are disciplined or charged with violating company rules. The provisions governing the time within which the hearing must be held vary greatly.

Both federal and state law[5] require the Railroads to make prompt investigations of all accidents involving injuries to employees and to file accident reports on those investigations. In turn, the Railroads require injured employees to file injury reports.

Before the Pretrial Order was lodged, the Railroads had interviewed and taken statements and releases from some injured employees within 15 days of the occurrence

---

3. Before passage, Chapter 512 was Senate Bill 376.

4. A total of 127 were filed against the Railroads in 1975; 51 were filed in the first six months of 1976.

5. 45 U.S.C. §§ 32, 38–43, 437 (1970), 49 C.F.R. § 225 and ORS 654.715 (1978).

that caused the injury. They have stated that they would continue to do so if they were not restricted by law.

Defendant Attorney General has agreed in the Pretrial Order that "Unless they are restrained by this Court the district attorneys and courts of the State of Oregon will enforce the statute according to its terms and apply it to the plaintiffs." The Pretrial Order also states that there are no pending prosecutions for violation of the challenged statutes.

The threshold question in any lawsuit brought in a federal court is, of course, whether it is the sort of matter the court is authorized to hear under Article III, Section 2 of the United States Constitution. *See, e. g., Steffel v. Thompson,* 415 U.S. 452, 458, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Specifically, the issue is whether or not the suit presents a justiciable "case" or "controversy."

"As is so often the situation in constitutional adjudication, those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government." *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). This case involves the "oldest and most consistent thread in the federal law of justiciability . . . that the federal courts will not give advisory opinions." *Id.* at 96, 88 S.Ct. at 1950, quoting C. Wright, *Federal Courts* 34 (1963).

In determining whether an action presents a justiciable "controversy" or just a request for an advisory opinion, the basic inquiry is whether or not the suit presents "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), quoted in [*e. g.*] *Steffel, supra,* 415 U.S. at 460, 94 S.Ct. 1209; *Lake Carriers' Assn. v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Adams v. Morton,* 581 F.2d 1314 (9th Cir. 1978); *Rincon Band of Mission Indians v. County of San Diego,* 495 F.2d 1, 4 (9th Cir. 1974).

Chapter 512 contains two different enforcement provisions. The penalty provision, ORS 17.990, provides that any person convicted of willfully violating ORS 17.-075(1) shall be fined not more than $1,000. The civil enforcement provision, ORS 17.-075(3), provides that any settlement obtained in violation of the other provisions may be disavowed by the injured employee within 12 months of the injury and "shall not be admissible evidence in any court action or administrative proceeding relating to the injury."

Thus, the challenged statute presents both a civil and a quasi-criminal [6] aspect. The two aspects require slightly different analyses.

I. *The Quasi-Criminal Aspect*

"Because the decision to instigate a criminal prosecution is usually discretionary with the prosecuting authorities, even a person with a settled intention to disobey the law can never be sure that the sanctions of the law will be invoked against him. Further, whether or not the injury will occur is to some extent within the control of the complaining party himself, since he can decide to abandon his intention to disobey the law. For these reasons, the maturity of such disputes for resolution before a prosecution begins is decided on a case-by-case basis, by considering the likelihood that the complainant will disobey the law, the certainty that such disobedience will take a particular form, any present injury occasioned by the threat of prosecution, and the like-

---

**6.** Willful violation of ORS 17.075(1) is not a "crime" as defined by ORS 161.515(1) because punishment by a term of imprisonment is not authorized. By limiting the possible penalty to a fine, ORS 17.990 defines the offense as a "violation." ORS 161.565, .575. A railroad convicted of violating ORS 17.075(1) would therefore not face the consequences of conviction of a "crime." ORS 161.565.

lihood that a prosecution will actually ensue."

*Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143 n. 29, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974) (dictum).

The first two factors mentioned are clearly met in this case. The parties agree in the Pretrial Order that the Railroads "have previously interviewed and taken statements and releases from some injured employees within 15 days from the date of the occurrence causing the employee's injury, and would continue to do so if not restricted by law." Indeed, the affidavit filed by the Railroads reveals that on at least one occasion since the filing of the Pretrial Order one of the Railroads has obtained a statement from an injured employee over his objection and within 15 days of his injury.

 Thus, the existence of a justiciable controversy in this case revolves around the threat of prosecution. In order to present a justiciable controversy, the threat of prosecution must be both "real and immediate," not "imaginary or speculative." *Steffel, supra,* 415 U.S. at 459, 94 S.Ct. 1209; *Golden v. Zwickler,* 394 U.S. 103, 108–110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *see Carey v. Population Services International,* 431 U.S. 678, 693 n. 3, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). I am satisfied that the threat of prosecution in this case is neither sufficiently real nor immediate so as to present a justiciable controversy.

Several factors interact to determine the reality and immediacy of a threat of prosecution.

### 1) *Specificity of the Statute*

The anti-abortion statute challenged by a physician in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), which the court found presented a justiciable controversy, was directed specifically at physicians. In so finding the Supreme Court relied, in part, on that fact. In *Carey, supra,* in which a justiciable controversy was also found, a state criminal statute limited the sale and distribution and prohibited the advertisement of contraceptives. It was challenged by one of the advertisers and vendors at which the statute was specifically directed. Thus, in these cases, it was clear that the challenged statute would be applicable to the plaintiffs.

Chapter 512 applies generally to employers without specific reference to railroad companies. But there is little doubt that courts and prosecuting authorities would interpret it as applying to the Railroads.

### 2) *Threats to Enforce*

In *Carey, supra,* *Steffel, supra,* and *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), the plaintiffs were threatened with prosecution if they did not cease specific activities. The authorities responsible for enforcing the statute challenged in *Carey, supra,* informed the plaintiff that specific actions on its part violated the statute. On at least one occasion they told the plaintiff that, if it failed to comply with the statute, the matter would be referred to the Attorney General for prosecution.

In *Steffel, supra,* a person who had been distributing handbills against the Vietnam war on the sidewalk of a private shopping center challenged the application of a state criminal trespass law to such activities. The police had twice warned him to stop picketing and had threatened him with arrest. The Court relied heavily on those facts in holding that the case presented a justiciable controversy when filed.[7]

A person who had frequently picketed a school challenged, in *Mosley, supra,* a recently enacted city ordinance that prohibited picketing within 150 feet of a school, except for peaceful labor disputes. When the plaintiff called the police department to determine the effect of the new ordinance on his activities, he was told that if he continued to picket he would be arrested. The Supreme Court held the ordinance un-

---

**7.** The Court remanded the case, however, for a determination whether, in light of the recent reduction of the United States' involvement in Southeast Asia, the case still presented a justiciable controversy. 415 U.S. at 459–60, 94 S.Ct. 1209.

constitutional without discussing the existence of a justiciable controversy.

A threat of prosecution more general than those in *Carey, supra; Steffel, supra* and *Mosley, supra,* was involved in *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), which presented a justiciable controversy. In *LaRue,* California Department of Alcoholic Beverage Control regulations prohibiting sexually explicit live entertainment and films in establishments licensed to sell liquor by the drink were challenged by a licensed establishment that stipulated to offering the proscribed entertainment. The Department of Alcoholic Beverage Control stipulated that it would take disciplinary action against any licensee violating the regulations.

*Rincon Band, supra,* which did not present a justiciable controversy, involved a threat of prosecution more general than the threat in *LaRue.* The tribe sought a declaration that a county ordinance prohibiting the use of property for gambling was inapplicable to their reservation after receiving a letter from the Sheriff stating that

> "State law, as well as the County ordinance, is quite specific relative to gambling, and all of the laws of San Diego, State, Federal and County, will be enforced within our jurisdiction. . . . [W]e feel that the laws of the State and the County are not made for a few, but meant to include everyone, and they shall be administered in that manner."

*Rincon Band, supra,* 495 F.2d at 4.

The threat of prosecution made in this case is less specific than the threats in *Carey; Steffel* and *Mosley,* all *supra,* and similar to the threat in *LaRue, supra,* in that it was made not in response to an alleged violation but rather during the course of litigation in the form of a stipulated fact. It is similar to the threat in *LaRue* and more specific than the threat in *Rincon* in that it relates to the plaintiffs and refers to a particular group of statutes rather than all laws.

■ The crucial distinction between the threat in this case and the threats in the other five cases rests on the identity of the person making it. The threats in the other five cases were made by, and thus reflected the intent of, officials responsible for enforcing the challenged statute, ordinance or regulation. In contrast, the threat in this case is not made by an official normally charged with enforcing the challenged statutes. District Attorneys are the officials authorized to initiate prosecutions for violations of Chapter 512. *See* ORS 8.660.[8] The Attorney General is authorized only to consult with, advise and direct the District Attorneys. ORS 180.060(4). It is impossible to discern from the record the extent to which the Attorney General's stipulation reflects the intent of the District Attorneys, the extent to which he has communicated his intent to them or the extent to which they would act in accordance with his intent.

I am unable to say, on the record as it stands, that the Attorney General's stipulation constitutes any more than an expression of his opinion as to what the District Attorneys are likely to do as opposed to a plain indication of an intent to enforce the challenged statutes. *Cf. LaRue, supra,* 409 U.S. at 112 n. 3, 93 S.Ct. 390.

In *Doe v. Bolton, supra,* and *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Supreme Court found the threat of enforcement sufficiently real and immediate to present a justiciable controversy even in the absence of an express threat by the authorities charged with enforcement. Other factors present in *Doe v. Bolton, supra,* demonstrated a sufficiently credible fear of prosecution: The abortion statute was specifically directed at physicians, it was "recent and not moribund" and there had been a history of prosecution under the challenged statute's predecessor. Chapter 512 is not directed

---

8. The Attorney General may investigate alleged violations of state law and initiate prosecutions only when the Governor has requested him to do so. ORS 180.070(1); *State ex rel. Thornton*

*v. Williams,* 215 Or. 639, 336 P.2d 68 (1959). There is no indication that the Governor has requested the Attorney General to investigate or prosecute alleged violations of Chapter 512.

specifically at the Railroads, nor is there a history of enforcement.

In *Epperson,* a teacher challenged state statutes that prohibited the teaching of evolution. The statutes were directed specifically at teachers. There had never been, however, any prosecutions during its 40 year existence, nor had the plaintiff been threatened with prosecution. Indeed, the statute may have been "more of a curiosity than a vital fact of life." *Id.* at 102, 89 S.Ct. at 269.

In *Rincon, supra,* 495 F.2d at 6, the Ninth Circuit suggested that Epperson might be distinguished on the ground that it involved the First Amendment. The plaintiffs in *Rincon, supra,* did not assert any fundamental rights. I am unable to distinguish *Epperson, supra,* on that basis, because the Railroads allege that Chapter 512 violates several of their constitutional rights, including their First Amendment rights.

I am satisfied, however, that *Epperson* does not require me to find a justiciable controversy in this case. The Supreme Court held the statute challenged in *Epperson* to be unconstitutional without discussing whether or not the case presented a justiciable controversy. Cases decided since *Epperson* have all emphasized that the threat of prosecution must be real and immediate. *E. g., Steffel, supra; Golden, supra.*

### 3) *History of Prosecution*

The fact that a challenged statute has been enforced against persons in circumstances similar to those of the plaintiff lends credibility to the plaintiff's fear of prosecution. *Steffel* is probably the most dramatic example of this. In *Steffel,* the plaintiff's handbilling companion was arrested and charged with violating the challenged statute. Thus, there was a very recent history of the statute being enforced against a person in virtually the same position as that of the plaintiff.

There was a history of prosecution under the challenged statute's predecessor in both *Doe v. Bolton, supra,* and *Carey, supra.*

In holding that *Rincon* did not present a justiciable controversy, the Ninth Circuit relied, in part, on the fact that it could not tell from the record whether there had been a history of prosecutions.

The Pretrial Order states that there are no pending prosecutions for violation of Chapter 512, and the Railroads have at no time produced evidence indicating that fact has changed.

Of course, Chapter 512 has only been in effect for approximately three years. This may be insufficient time for a policy of enforcement or nonenforcement to become apparent. Thus, the apparent lack of prosecution of Chapter 512 violators does not necessarily demonstrate a policy of nonenforcement as in *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). Nonetheless, the Railroads' fear of prosecution is not bolstered by a history of prosecution.

### 4) *Recent Enactment*

In finding that *Doe v. Bolton, supra,* presented a justiciable controversy, the Supreme Court relied, in part, on the fact that the anti-abortion statute was "recent and not moribund." *Id.,* 410 U.S. at 188, 93 S.Ct. 739.

The plaintiff in *Union Pacific Railroad Company v. Woodahl,* 308 F.Supp. 1002 (D. Mont. 1970), challenged a state statute regulating the number of hours certain railroad employees could work. In holding that the case presented a justiciable controversy, the court interpreted the fact that the challenged statute had been recently amended as indicating the intent of the legislature to maintain its vitality. *Id.* at 1013–14.

The fact that Chapter 512 was enacted approximately three years ago would indicate that the legislature, at least, intends that it be enforced.

### II. *The Civil Aspect*

The enforcement and effect of a civil statute, unlike a criminal statute, are not usually dependent upon discretionary action

by some official responsible for enforcement. The mere existence of a civil statute is therefore more likely to present a real and immediate threat of injury than the mere existence of a criminal statute. *Cf. Rail Reorganization, supra,* 419 U.S. at 143 n. 29, 95 S.Ct. 335; *see generally Duke Power Co. v. Carolina Environ. Study Group, Inc.,* —— U.S. ——, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978). This may be particularly true when a civil statute is challenged on its face. *See Sea Ranch Ass'n v. California Coastal Zone Cons. Com'ns,* 537 F.2d 1058, 1063 (9th Cir. 1976).

■ Notwithstanding the relative ease or difficulty with which it may be done, the plaintiff in any case bears the burden of demonstrating that the suit presents an existing justiciable controversy. The standard is the same as in challenges to criminal statutes; the plaintiff must demonstrate a "real and immediate" threat of injury. *See, e. g., O'Shea, supra,* 414 U.S. at 493–4, 94 S.Ct. 669; *Sea Ranch, supra,* 537 F.2d at 1063.

In their complaint, the Railroads allege that, if Chapter 512 is applied to them and enforced according to its terms, they will suffer specified injuries including being

1) hindered in their attempts to follow the hearing process mandated by their collective bargaining agreements with their employees' unions,
2) prevented from exercising their rights to free speech in communicating with their employees, and
3) prevented from promptly and properly investigating the causes of accidents in which employees are involved and injured and therefore being
 a) hindered in their attempts to eliminate hazards,
 b) placed at a disadvantage in negotiating claims because the employees may make statements to their own representatives, and
 c) hindered in preparing and filing the accident reports required by law.

■ Such circumstances, if true, might constitute sufficiently real and immediate threats of injury to present a justiciable controversy. It is, however, the Railroads' responsibility to show by affidavit or other evidence that such alleged injuries are in fact either occurring or threatened. *See Poe v. Ullman, supra,* 367 U.S. at 501, 504–05, 81 S.Ct. 1752; *Rincon, supra,* 495 F.2d at 5. They have not done so.

■ The only affidavit filed contains the transcript of a disciplinary hearing held seven days after a switchman's injury. At that hearing, a statement regarding the cause of the occurrence in which he was injured was taken from the switchman over his objection that the Railroad was violating ORS 17.075 by holding the hearing at that time.

The affidavit contains no indication that the switchman has disavowed the statement, that there has been a court or administrative proceeding at which the Railroad wanted to or attempted to introduce the statement, that the Railroad was threatened with prosecution for obtaining the statement or that the Railroad suffered any other detriment as a result of the hearing. Thus, the affidavit does not demonstrate that the challenged statutes subject the Railroads to some real and immediate threat of injury. Rather, it shows one occasion on which the Railroad apparently ignored the statute with impunity.

The parties submitted six exhibits with the Pretrial Order, including information about FELA actions filed against the Railroads, segments of the collective bargaining agreements between the Railroads and their employees' unions and the accident report forms that the Railroads and their employees must file.

The only information submitted about the FELA claims was whether the action was filed in federal court or state court and whether it was filed in Oregon or in another state. The Railroads did not furnish any evidence indicating that statements or releases were taken within 15 days of injury from any of the employees filing FELA actions or that, if statements or releases were taken, the Railroads wanted or attempted to introduce them as evidence in

any of the many FELA actions. No information about any other court or administrative proceedings relating to employee injuries was filed. Thus, it is impossible to discern from the record whether or not Chapter 512 is interfering or threatens to interfere with the Railroads' ability to defend itself against FELA actions or in any other court or administrative proceedings.

No information about settlements was submitted, so I am unable to determine whether Chapter 512 interferes or threatens to interfere in any way with the Railroads' ability to negotiate settlements.

The collective bargaining agreements provide time periods within which disciplinary hearings must be held. Some of them provide for postponement of the hearing upon mutual agreement of the parties. Most provide an outer time limit greater than 15 days from the date of injury. Some of the provisions require hearings in less than 15 days from the date an employee is withheld from service. The Railroads have submitted no evidence, however, relating to the withholding of employees from service.

I am unable to determine from the face of the collective bargaining agreement provisions whether or not observing the requirements of Chapter 512 would interfere or threaten to interfere with the Railroads' discharge of their responsibilities under the collective bargaining agreements. The Railroads have not supplemented the bare text of the collective bargaining agreements with evidence indicating that such interference has occurred or is threatened.

ORS 654.715(1) requires the Railroads to make an immediate telephonic report of certain accidents. It does not expressly require the Railroads to report the causes or circumstances of the accidents. 49 C.F.R. § 225.9(a) also requires the Railroads to make an immediate telephonic report of certain occurrences, but it requires notification of the "circumstances" of the occurrence. 45 U.S.C. § 32 requires the Railroads to make a statement "forthwith" in writing of the fact of certain accidents. I am unable, however, to determine from the record and the language of these provisions whether it is necessary to take a statement from an injured employee in order to obtain sufficient information to make such reports.

45 U.S.C. § 38 and 49 C.F.R. § 225.11(a) require the Railroads to make monthly reports of accidents, including in the reports the nature, causes and circumstances of the accidents. The reports must be submitted within 30 days of the expiration of the month during which the accidents occurred. 49 C.F.R. § 225.11(a). Thus, if the Railroads observe the 15-day waiting period required by 17.075(1), they would still seem to have at least 15 days in which to obtain and report information about an occurrence. That period is not so obviously inadequate that I am able, without additional supporting evidence, to say that observing the 15-day waiting period will interfere with the preparation of the reports. The Railroads have not submitted such supporting evidence.

Even if I were to find that observing the 15-day waiting period would interfere with the completion of the reports, it is not clear that the Railroads would be required to observe the waiting period. ORS 17.075(2) expressly states that the prohibition on obtaining statements within 15 days *does not apply* to the extent that it is necessary to obtain a statement within 15 days of injury in order to comply with state or federal reporting requirements. The Railroads argue that disputes over the interpretation of ORS 17.075(2) render its protection ineffective. They have, however, introduced no evidence indicating that there are such disputes or how such disputes would affect their conduct.

The Railroads have also failed to furnish any evidence indicating that the requirements of Chapter 512 would interfere with their communication with employees or the elimination of hazardous conditions.

*Conclusion*

I am satisfied that the Railroads do not suffer from a real and immediate threat of injury from either the quasi-criminal or civil aspects of Chapter 512.

Chapter 512 has been recently enacted, indicating that the legislation intends it to be enforced. Nevertheless, the Railroads have failed to demonstrate that a party authorized to enforce it intends to enforce it against them.

The Attorney General has stated that it will be so enforced, but the Railroads have not demonstrated that his statement reflects the intent of or is binding in any way upon the authorities responsible for enforcement. Moreover, there is no history of enforcement to buttress the credibility of the Attorney General's statement or to remove the speculative quality of the Railroads' fear of prosecution.

A statement by an official not charged with enforcing the statute and the fact that the Chapter has been recently enacted do not establish a sufficiently real and immediate threat of prosecution to present a justiciable controversy.

The Railroads have furnished virtually no evidence that the civil aspects of the Chapter cause them a real and immediate threat of injury. They have submitted evidence that they have violated the statute on at least one occasion, apparently with no adverse consequences. They have submitted no evidence indicating that compliance with the Chapter or any other violations of it would cause or threaten to cause them any injury.

I find and hold that this action does not present a justiciable controversy because the challenged statutes do not present a real and immediate threat of injury to the Railroads.

> "This court can have no right to pronounce an abstract opinion upon the constitutionality of a State law. Such law must be brought into actual or threatened operation upon rights properly falling under judicial cognizance, or a remedy is not had here."

*Cherokee Nation v. State of Georgia*, 30 U.S. (5 Pet.) 1, 75, 8 L.Ed. 25, quoted in *Poe v. Ullman, supra*, 367 U.S. at 504, 81 S.Ct. at 1756.

For these reasons, therefore, I conclude that this action must be dismissed.